UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

MICHAEL ANTWON HOWARD,

       Plaintiff,

v.                                 Case No. 3:10-cv-81-J-32JBT

JACQUES MEMNON, et al.,

       Defendants.

_____/

## <u>REPORT AND RECOMMENDATION</u>[1]

    Plaintiff, an inmate of the Florida Department of Corrections (hereinafter DOC) who is proceeding <u>pro se</u>, initiated this action by filing a Civil Rights Complaint Form (Doc. #1) (hereinafter Complaint), in which he names the following Defendants,[2] who at all pertinent times were employed at Union Correctional Institution (hereinafter UCI): (1) Correctional Officer Jacques Memnon; (2) Lieutenant Robert Newell; (3) Sergeant Anthony Crosby; (4) Dr. Cecelia Trivino; (5) Nurse Christine Green; (6)

---

[1] "Within 14 days after being served with a copy of [this Report and Recommendation], a party may serve and file specific written objections to the proposed findings and recommendations.  A party may respond to another party's objections within 14 days after being served with a copy."  Fed. R. Civ. P. 72(b)(2); <u>see</u> <u>also</u> 28 U.S.C. § 636(b)(1); M.D. Fla. R. 6.02(a).  "A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."  28 U.S.C. § 636(b)(1).

[2] It appears that Plaintiff has misspelled several Defendants' names.  The Court will use the spelling of the Defendants' names provided by the Defendants.

Nurse Payne;[3] (7) Classification Supervisor Michael Davis; (8) Correctional Probation Officer James Johns; (9) Lieutenant Joseph Allen; and (10) Dr. Julian Aviles.  This cause is before the Court on Defendants' Motion to Dismiss or in the Alternative Motion for Summary Judgment (Doc. #96) ("Motion")[4].  Plaintiff has responded.[5]  See Plaintiff's Amended Motion in Opposition and Response to Defendants' Motion to Dismiss/Summary Judgment (Doc. #106) ("Plaintiff's Response"); Sworn Affidavit (Doc. #107).  Pursuant to the Standing Order (Doc. #1) in Case No. 3:12-mc-44-J-99MMH-JBT, the dispositive motion has been referred to the undersigned for issuance of a report and recommendation.  For the reasons stated herein, the undersigned **RECOMMENDS** that the Motion be **GRANTED**.

## I.    Summary of Recommendation

Preliminarily, insofar as Defendants request the Court to dismiss the claims against Defendants Memnon, Newell, Crosby, Davis, Trivino, Allen and Johns for Plaintiff's failure to exhaust his administrative remedies, the undersigned

---

[3] Both the Court and Plaintiff made efforts to discover the true identify of this Defendant, but were unable to do so.  Thus, she was never served.  However, the undersigned will hereinafter recommend that the claims against her be dismissed as frivolous.

[4] This motion was filed on behalf of Defendants Memnon, Newell, Crosby, Davis, Johns, Allen, Trivino and Aviles.  Defendant Green has not filed a dispositive motion.  However, the undersigned will hereinafter recommend that the claims against her be dismissed as frivolous.

[5] The Court advised the pro se Plaintiff of the provisions of Fed. R. Civ. P. 56, and gave him an opportunity to respond.  See Order (Doc. #4) at 4-5; Order (Doc. #14) at 3-5; Order (Doc. #105) at 1.

recommends that the Motion not be granted on this basis.  The Defendants have not met their burden of establishing Plaintiff did not exhaust his administrative remedies.

The undersigned recommends that the Motion be granted and summary judgment be entered in Defendants' favor with respect to Plaintiff's excessive force claims against Defendants Newell and Crosby.  Upon review of the substantial record, there are no genuine issues of material fact that should be decided at trial regarding these excessive force claims.

The undersigned also recommends that summary judgment be entered in favor of Defendant Aviles.  Plaintiff claims that Defendant Aviles was deliberately indifferent to Plaintiff's serious medical needs.  However, the record reflects that Plaintiff is attempting to hold Defendant Aviles liable on the theory of respondeat superior, which has been rejected as a theory of liability in civil rights cases filed pursuant to 42 U.S.C. § 1983.

Additionally, the undersigned recommends that summary judgment be entered in favor of Defendants Memnon, Davis, Johns and Allen.  Plaintiff claims that Defendant Memnon falsely charged Plaintiff with possessing a weapon and that Defendants Davis, Johns and Allen denied Plaintiff due process of law in processing this charge.  However, the falsification of a prison disciplinary report does not rise to the level of a federal constitutional claim.  Moreover, the record reflects that Plaintiff received all the process to which he was entitled with respect to the processing of this charge.  The undersigned also recommends that summary

3

judgment be entered in favor of Defendants Allen and Johns because they are entitled to qualified immunity.

Finally, the undersigned recommends that the following claims raised in the Complaint be dismissed with prejudice as frivolous: (1) that Lieutenant Newell subjected Plaintiff to cruel and unusual punishment by collaborating with medical staff members to give Plaintiff an involuntary injection; (2) that Nurse Payne and Nurse Green subjected Plaintiff to cruel and unusual punishment by injecting Plaintiff without his consent; (3) that Dr. Trivino subjected Plaintiff to cruel and unusual punishment by authorizing the injection; and (4) all of the Defendants violated Plaintiff's rights to equal protection and due process of law based upon the factual allegations in the Complaint.  Dismissal with prejudice is warranted because it would be futile for Plaintiff to try to amend his Complaint.

## II.    Summary of Plaintiff's Complaint

Plaintiff alleges the following facts in support of his claims.  On February 24, 2008, at approximately 5:00 p.m., while Plaintiff was housed at UCI in the Transitional Care Unit, Plaintiff approached his cell door to receive his evening meal.  Complaint at 15.[6]  Officer Memnon denied Plaintiff his evening meal, stating, "I don't know why your snitching ass [is] standing at the door[,] you ain't [sic] eating tonight

---

[6] The pages of the Complaint were not sequentially numbered.  Therefore, the Court cites the sequential page numbers it has inscribed on the bottom right corner of each page of the Complaint.

snitching bitch." Id.  Thereafter, Officer Memnon "exited the quad and began falsifying his report that Plaintiff showed him a homemade knife." Id.

Nearly an hour later, Lieutenant Newell approached Plaintiff's cell and said "cuff up this is your only chance." Id.  Lieutenant Newell did not inform Plaintiff that he was being accused of possessing a weapon and that his cell needed to be searched. Id.  Plaintiff refused to comply with this order. Id.  Lieutenant Newell then departed, returning moments later with a cell extraction team consisting of five correctional officers. Id.  At this time, Plaintiff willingly approached his cell door so that he could be handcuffed; however, the handcuffs were not applied. Id.  Instead, Lieutenant Newell ordered that Plaintiff's cell be opened.  Id.

> Plaintiff then quickly laid down on his stomach with his hands behind his back "totally submitting" to the cell extraction team without any form of resistance as the extraction team entered his cell[.] Lt. Newell then stepped in front of the video recorder[.] [A]s the extraction team began assaulting the plaintiff[,] he felt something being slammed into his back repeatedly as his back made [a] cracking sound and ached in pain while the extraction team[] yelled "stop resisting."

Id.

Plaintiff was then placed in leg irons and handcuffs. Id.  Thereafter, Sergeant Crosby grabbed Plaintiff's right index finger and pulled it back "removing it from [the] joint[.]" Id.  The finger began to swell instantly.  Id.

The members of the extraction team escorted Plaintiff to the medical treatment room and "began cutting plaintiff's clothing off his body until he was completely

nude." Id. at 16.  Nurse Green, assisted by Nurse Payne, injected Plaintiff with Haldol and Benadryl, without Plaintiff's consent and before giving him an opportunity to refuse such treatment.  Id.  Nurse Green examined Plaintiff for injuries and "placed his finger back in its joint."  Id.  Plaintiff was then escorted back to his cell. Id.  Early the next morning, Plaintiff declared a psychological emergency.  Id.  He was then "rehoused in T-Dorm" at UCI.  Id.

On March 18, 2008, Plaintiff was given three disciplinary reports.  Id.  Officer Memnon charged Plaintiff with possession of a weapon.  Id.  Lieutenant Newell charged Plaintiff with disobeying a verbal order and Officer Hall (not a Defendant) charged Plaintiff with destruction of state property.  Id.  These disciplinary reports were forwarded to Michael Davis, a classification supervisor at UCI, for review.  Id. The charges were then forwarded to James Johns, the chairman of the disciplinary team, and Lieutenant Joseph Allen, a member of the disciplinary team.  Id.  At a hearing held on March 28, 2008, "plaintiff was found guilty of all 3 reports stated above without [the] team stating enumerated specific facts or sufficient evidence relied on in [rendering] judgement."  Id.

Plaintiff appealed all three disciplinary reports.  Id.  The charges of disobeying a verbal order and destruction of state property were upheld; however, the charge of possession of a weapon was overturned.  Id. at 16-17.

"In the months following 2-24-08 to the present[,] plaintiff has been suffering from headaches[,] back pains/spasms, mental stress[,] discomfort[,] barely ledgeable

[sic] handwriting and swelling from injuries sustained in force[] used on 2-24-08." Id. at 17.  Plaintiff submitted numerous sick call requests, but "was denied all therapy, or x-rays, prescribed medication for pain or examination by a specialist." Id.  Dr. Aviles denied Plaintiff "all treatment[.]" Id.  On May 12, 2009, after Plaintiff filed a grievance regarding his inadequate medical care, Dr. Nazareno examined Plaintiff and concluded that there was nothing he could do to treat Plaintiff's right index finger. Id.  Plaintiff cannot completely bend this finger, and it is permanently swollen. Id.  However, Dr. Nazareno ordered x-rays of Plaintiff's back. Id.  On May 15, 2009, x-rays were taken of Plaintiff's lower back, even though Plaintiff was having issues with his mid-back. Id.

On May 16, 2009, Plaintiff filed another grievance addressing his inadequate medical care. Id.  Dr. Aviles denied the grievance and refused to provide treatment, "forcing plaintiff to continue to live in pain, discomfort[,] suffering and mental stress with the possibility of suffering further damage in the future." Id.

Based upon the factual allegations set forth above, Plaintiff raises the following claims: (1) Officer Memnon falsified the February 24, 2008 disciplinary report for possession of a weapon, in violation of the Eighth and Fourteenth Amendments to the United States Constitution; (2) Lieutenant Newell subjected Plaintiff to cruel and unusual punishment by failing to protect Plaintiff from the February 24, 2008 use of excessive and unjustified force during the cell extraction and by collaborating with medical staff members to give Plaintiff the subsequent

7

involuntary injection; (3) Nurse Payne and Nurse Green subjected Plaintiff to cruel and unusual punishment by administering an injection without Plaintiff's consent; (4) Michael Davis deprived Plaintiff of due process of law by failing to adequately review the disciplinary reports before forwarding the falsified reports to the disciplinary team; (5) Dr. Trivino subjected Plaintiff to cruel and unusual punishment by authorizing the injection; (6) Sergeant Crosby subjected Plaintiff to cruel and unusual punishment by pulling Plaintiff's right index finger until it popped out of its joint; (7) James Johns and Joseph Allen deprived Plaintiff of due process of law by finding Plaintiff guilty of the charge of possession of a weapon without following proper procedures; (8) Dr. Aviles was deliberately indifferent to Plaintiff's serious medical needs by failing to adequately treat the injuries Plaintiff received during the cell extraction; and (9) all of the Defendants violated Plaintiff's rights to equal protection and due process of law based upon the factual allegations summarized above.

### III.   Summary of Defendants' Motion

The Defendants specifically deny Plaintiff's allegations of wrongdoing.  In his sworn affidavit, Officer Memnon states:

> On February 24, 2008, while assigned as a Correctional Officer to Union Correctional Institution, I was conducting feeding of the inmates on U dorm. Food trays are delivered to the inmates on the dorm by unlocking the cuffport flap and inserting the food tray.  At approximately 17:10, when I approached Michael Howard's cell, I observed him with a homemade weapon.   Howard threatened me with the weapon saying he was going to stick my "pussy black ass" if I opened the cuffport door.  I

8

reported my observation and Howard's threats to my supervisor.

I was then authorized to initiate a disciplinary report against Howard, which I did at approximately 17:30. I wrote only that portion of the disciplinary report in which I recorded my observations of Howard with the weapon and his threatening statement to me and then turned in my report. While it did come to my attention that a weapon was found in Howard's cell, since I was occupied in writing the report, I was not present for the cell extraction and cell search in which the weapon was found. The notations in the final disciplinary report of cell extraction, discovery and description of the weapon was [sic] added after I had already turned in my recorded observations. The subsequently added notations support the fact that I observed Howard in possession of a homemade weapon.

D.E.[7] B-B1 (paragraph enumeration omitted).

In his sworn affidavit, Lieutenant Newell describes the relevant events as follows:

On February 24,2008, while I was assigned to Union Correctional Institution, it was reported to me that Howard was in possession of homemade weapon in his cell.

Starting at approximately 6:10 pm, I repeatedly ordered Howard to surrender the weapon but he refused to do so. Howard also refused orders from Captain McGlew to surrender the weapon. Authorization to use force to recover the weapon was received from the Duty Warden and a cell extraction team was assembled. Howard refused all orders to surrender the weapon.

---

[7] The Court hereinafter refers to the exhibits appended to the Motion (Doc. #96) as "D.E."

The cell extraction team entered the cell and Howard was restrained by the team despite his resistance. Howard was then taken for a medical examination. Howard was given an injection authorized by Dr. Trivino with force if necessary due to threats to harm staff and severe agitation. The weapon was found concealed in his mattress. I observed no staff member on the extraction team use any more than the necessary amount of force to remove Howard from the cell so the weapon could be recovered. The weapon that was recovered was an eyeglass temple piece sharpened on one end and wrapped on the other end to form a handle. I also observed no staff member use any more than the necessary amount of force in order to have medical staff administer medication.

Howard's claim that I executed force that wasn't a last resort by not allowing him to come out of his cell in front of the cameras is untrue. Howard refused to surrender the weapon and refused to submit to restraint procedures so a cell search could be conducted in order to recover the weapon. Howard was in possession of a weapon. He had threatened to use that weapon against staff. He was not allowed to have a weapon in his cell or in his possession. Howard was given several opportunities to relinquish the weapon and submit to restraint procedures, but he refused. To allow Howard to come out of his cell unrestrained without knowing the whereabouts of the weapon would have been extremely dangerous to staff as they could have been subject to attack by Howard with the weapon. Entry into his cell in order to secure and restrain him and retrieve the weapon was necessary for the safety and order of the institution.

Howard's claim that I failed to protect him or intervene in alleged assaults by the extraction team is untrue. I observed the extraction team as they entered the cell and restrained Howard. I did not see anyone assault Howard other than to pin him to the floor with the shield and apply restraints to him. At no time did I see any staff either during the extraction or post extraction, use

10

> anything more than the minimal amount of force necessary to restrain Howard and curtail the threat he presented. If I had observed any improper activity by staff, I would have intervened if possible and reported such action to my superiors. Due to the small size of the cell, the number of staff members in the cell attempting to restrain Howard and the rapid speed in which a cell extraction takes place, even if some improper act had occurred within the cell, it would have been difficult if not impossible for me to see such improper act or intervene with any immediate result.
>
> Howard's claim that I collaborated with medical staff to have him given an injection is untrue and ridiculous. I am not a medical professional nor am I authorized to dispense medical advice. Howard's threatening behavior was reported to medical staff and the medical decision to give him medication was made solely by medical staff. I did not collaborate in any way with medical staff other than to report Howard's threatening and agitated behavior.

D.E. C-C1 (paragraph enumeration omitted).

Sergeant Crosby states in his sworn affidavit that he was a member of the cell extraction team that responded to Plaintiff's cell due to a report of his possessing a weapon. D.E. D. He was the third member of the extraction team to enter the cell. Id. When Sergeant Crosby entered the cell, Plaintiff was "on the floor face down actively resisting attempts to restrain him." Id. Sergeant Crosby describes the events that ensued as follows:

> While on Howard's left side, I placed my left knee on his back to pin him to the floor. I used both of my arms to restrain his left arm and placed it behind his back. Another officer was restraining Howard's right arm and placing it behind his back. Once Howard's left arm was forced into place to be handcuffed, I used my right hand to

continue to control his left arm and applied the handcuffs to both wrists. By holding Howard's upper arms, we lifted Howard up and escorted him out of the cell and to the medical area. Due to his active resistance, Howard had to be held down during the medical examination and treatment by medical staff.

Howard's claim that I bent his finger back is untrue. There were at least four other officers in the cell attempting to restrain Howard's resistance, by holding or attempting to hold him. . . . To take the time to bend his finger back would have caused me to either fully or partially release my hold on his arm to grasp his finger with my other hand/arm(s). . . . I had no time or desire to bend his finger when it was of the utmost importance to apply the wrist restraints while at the same time securing his left arm.

Ex. D-D1 (paragraph enumeration omitted). Sergeant Crosby also states that he did not observe anyone bend Plaintiff's finger, punch or kick him, or use any more force than was necessary to restrain him. Id. at D1.

Pursuant to the Court's Order (Doc. #130), Defendants filed, under seal, copies of the fixed wing videotapes and the hand held videotape that captured the events in question. See (Doc. #S-5). The Court notes that the fixed wing videotapes are not very clear. Moreover, the only one of the four cameras (from the Quad 2A U-Dorm camera) that captured the events in the cell had a partially obstructed view and was so far away that it is impossible to tell what occurred in the cell from viewing that videotape. The hand held video shows the team members going into Plaintiff's cell and using what appears to be minimal force to control Plaintiff until he be could be placed in restraints. It also shows Plaintiff being escorted to the medical

department and being held down on a table so that the nurse could examine him. From a review of the handheld videotape, it does not appear that Plaintiff had any injuries; however, he can be heard stating that someone broke his finger.

The Defendants also supplied the Affidavit of Robert Hill, a correctional officer at UCI.  See D.E. E.  On February 24, 2008, he conducted a search of Plaintiff's cell and "found a weapon that was made out of an eyeglass temple piece, sharpened on one end and wrapped in cloth to form a handle on the other end.  The weapon was found hidden inside Howard's mattress."  Id.  Defendants also submitted a copy of a photograph of the weapon in question, which reflects that the weapon was approximately six inches long.  See Ex. N1C.  According to the records submitted by Defendants, this "contraband was disposed of per Department policy."  Ex. N1B (some capitalization omitted).

Based on the events of February 24, 2008, Plaintiff received three disciplinary reports, charging him with possession of a weapon (see Ex. N1-N1G), disobeying orders to submit to handcuff procedures and to surrender the weapon (see Ex. N2-N2A) and destruction of state property (alleging that the mattress in which the weapon was found was torn beyond repair).  See Ex. N3-N3A.  He was found guilty of all three charges.  See Ex. N.

Defendants James Johns and Joseph Allen provided affidavits, in which they state that they were members of the disciplinary team convened for a hearing on Plaintiff's disciplinary report for possession of a weapon.  See Ex. H; Ex. I.  These

13

two Defendants assert that Plaintiff was present at the hearing and pled not guilty.

Id. The members of the hearing team found Plaintiff guilty of the offense based upon

the eyewitness testimony of Officer Memnon, "who observed Howard to be in

possession of a homemade shank."  Id.

Plaintiff appealed his disciplinary report for possession of a weapon, and the

appeal was approved.  Ex. O1B.  The pertinent portion of the decision states:

> The disciplinary report you received on 2/24/08 for
> violation of 3-1; DR Log #213-080461 has been
> overturned.  Our decision to overturn the disciplinary
> report was based on technical errors made in the
> processing of same.  All necessary adjustments will be
> made to your inmate file and record.[8]

Id.  Defendants submitted the Affidavit of Milton Hicks, the Warden of UCI at the

pertinent time, in which he provides the following explanation as to why he

overturned the disciplinary report.

> Upon my review of Michael Howard's Possession of a
> Weapon disciplinary report (DR), I overturned the DR
> based on the absence of the name of the officer who
> actually found the weapon in the DR.  This was purely a
> technical error and I have no reason to believe that a
> weapon was not actually found in Howard's cell.

Ex. F.

---

[8] Defendant Michael Davis submitted an affidavit, in which he denied forwarding any false disciplinary reports for further action.  He states that the only action he took with respect to the disciplinary report for possession of a weapon "was to authorize the presence of another classification officer to be present for training purposes and to notate on the Grievance Appeal Action Form that this disciplinary report was removed from the database."  D.E. G.

The Defendants have provided the pertinent portion of Plaintiff's medical records, see D.E. M, and affidavits from three physicians describing Plaintiff's medical care after the February 24, 2008 cell extraction.  In her sworn affidavit, Dr. Trivino describes her involvement in this case as follows:

> On the date listed in the complaint, I was employed by the Department of Corrections as a psychiatrist.  I do not have an independent recollection of the incident. However from my review of the Physician Order Sheet, I received a telephone call from nursing staff at Union Correctional Institution informing me that inmate Michael Howard was acting in an agitated state with hostile and physical aggression.  The Physician Order Sheet also reflects that Howard had brandished a homemade weapon in his cell.  This record reflects that I telephonically issued an Emergency Treatment Order for Haldol 10 milligrams and Benadryl 100 milligrams and authorized force if necessary for administration.  I had no reason to doubt the accuracy of the reports of Howard's behavior.
>
> In my professional medical opinion this was an appropriate decision given the reports of Howard's behavior.  This decision was based on my medical experience and expertise in the field of psychiatry.

Ex. J.

Defendants have also provided the Affidavit of Hantz Hercule, a physician employed by the DOC.  Dr. Hercule summarizes Plaintiff's medical records and describes Plaintiff's medical care as follows:

> I am a medical doctor licensed by the State of Florida since 2007.  I am currently employed by the Department of Corrections as the Acting Director of Medical Services.  I have engaged in the practice and research of medicine since 1998.

In my current position I have oversight responsibility for the delivery of health services to inmates within the Department.

For purposes of this affidavit, I have reviewed the relevant medical records which have been provided to me for Michael Howard, DC# X13370.

My review of this medical record reflects the following.

(1)   Howard was provided a post use of force examination on February 24, 2008.   No injuries were identified by the examining nurse other than a superficial abrasion on Howard's upper right back.   Although Howard complained that his right index finger was broken, the examination revealed no edema, no dislocation, a full range of motion and rapid capillary refill.   A rapid capillary refill reflects a good vascular status without compromise of the blood vessels.   It is a good indicator that the circulatory system is unaffected by any purported trauma. The record also reflects that an Emergency Treatment Order was authorized by Dr. Trivino for Haldol based on Howard's behavior.   Haldol is a prescription medication used to address agitated, aggressive and hostile behavior. Force, if needed was authorized for the administration of the Emergency Treatment Order.    Under these circumstances of Howard's agitated behavior, threats and history of self harm, Dr. Trivino's actions appear appropriate.

(2)   Following the February 24 incident, Howard self inflicted an injury by cutting himself in the left forearm. He was placed in the Isolation Management.    The Chronological Record reflects that Howard was manipulating to escape U-Dorm and his story was noted to be inconsistent and with omissions. Howard was noted as stating that "If I have to go back to U-Dorm, I'll kill myself right now."

16

(3)     On July 7, 2008, Howard was involved in an altercation with another inmate.  He made no claims of any back or finger pain at that time.

(4)     On July 31, 2008, Howard was examined by Dr. Nguyen for complaint of thigh pain and back pain.  Dr. Nguyen noted the previous surgical removal of a sarcoma (cancer) from his leg the previous year.  As to his back, Dr. Nguyen noted that Howard had a full range of motion with negative neurological deficit and negative swelling. Dr. Nguyen determined that no further medical attention was needed and prescribed Ibuprofen 600 milligrams. Howard was advised to return to the clinic as needed.

(5)     On August 20, 2008, Howard received a Generic Nursing Assessment relevant to a complaint about his right index finger pain.  He was examined by Dr. Nguyen, who noted that Howard had a full range of motion in the finger, with only mild swelling in the middle interphalangeal joint.  Dr. Nguyen prescribe[d] Howard Ibuprofen 600 milligrams, twice a day and he was advised to return to the clinic as needed.

(6)     On October 8, 2008, Howard was seen for a back pain assessment.  He indicated the onset and duration of his mid-lower back had been for a month.  No swelling, discoloration or decreased range of motion was noted.  Howard was advised to return to the clinic if no improvement within 7 days.

(7)     On December 19, 2008, Howard received another generic nursing assessment relevant to his complaints of headaches and lower back pain.  He complained of pain in the mid-thoracic region.  Howard was noted to be in no acute distress and his gait appeared normal.

(8)     On April 27, 2009, Howard received a back pain assessment when he complained of middle and lower back and right index finger pain.  Howard indicated that it was only a problem every now and then and then not all

the time.  Howard was able to bend at the waist all the way forward, backwards and side to side without any pain or discomfort.   He had no spasms, swelling or discoloration. Minimal deformity was noted in the second joint of the index finger with a decrease in range of motion due to discomfort.   He was provided Ibuprofen 600 milligrams.

(9)    On May 15, 2009, Howard was provided x-rays of the lumbar (lower back) region.   The AP or anteroposterior view was noted to be normal.

(10)    On June 16, 2009, Howard again complained of mid-back pain alleging that it was due to an unspecified use of force.  Howard received instructions on exercises to increase the range of motion and strengthen the muscle structure.   Negative spasms and rigidity were noted. He was noted to have discomfort with touch above the left side scapula.

(11)    On September 8, 2009, Howard was again involved in a use of force.  During the post use of force medical examination he denied any injury or pain.

(12)    Howard received another back pain assessment requesting a front cuff pass on April 29, 2010[,] complaining of pain across the mid back.  He stated it was unknown what he was doing when the pain first began.  He also complained of onions in his diet.

(13)    On April 29, 2010, Howard received x-rays of the lumbar and thoracic region of his back. The lumbar series reflected a normal study.  The thoracic series noted mild scoliosis and moderate kyphosis.   No other abnormalities were noted.

Scoliosis is not a disease but a descriptive term that describes a curvature of the spine from side to side.  In most cases, the cause is idiopathic or unknown.  The remaining cases are either non-structural or structural.  A non-structural or functional condition is temporary and

results in the curvature of an otherwise normal spine due to another problem such as one leg being shorter than the other, muscle spasms or appendicitis.  The structural condition occurs when the spine is not normal and caused by another disease process such as a birth defect, muscular dystrophy, metabolic disease or a connective tissue disorder.

Kyphosis likewise is a descriptive term for a curvature or rounding of the thoracic region from front to back. In adults, the causes may include osteoporosis, degenerative arthritis of the spine, ankylosing spondylitis (another form of arthritis), connective tissue disorders, tuberculosis and other infections, cancer or tumors, spina bifida or paralyzing conditions such as cerebral palsy and polio.

(14)   On April 18, 2011, Howard received another set of x-rays of the thoracic and lumbar regions.  Both sets reflected a negative impression with no scoliosis or rotation identified.

The initial diagnosis of scoliosis and kyphosis are not evidence of a purported trauma or impact.  These are not spinal changes that would be caused by sudden impact or abnormal force. In any event, the initial reflections of scoliois and kyphosis are not supported by further x-rays subsequently taken of Howard's back which reflect normal impressions.  There is nothing in these records to objectively reflect that Howard's alleged back pain and finger pain was [sic] caused by the cell extraction in February, 2008.

D.E. L-L3 (some paragraph enumeration omitted).  Dr. Aviles also provided a sworn affidavit, in which his summarization of Plaintiff's medical records and care mirrors that of Dr. Hercule as set forth above.  See D.E. K.

### IV.    Standard of Review

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id. (citing Twombly, 550 U.S. at 556).  "[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  Id. (citing Twombly, 550 U.S. at 555).  However, "'[p]ro se pleadings are held to a less stringent standard than pleadings drafted by attorneys' and are liberally construed."  Bingham v. Thomas, 654 F.3d 1171, 1175 (11th Cir. 2011) (per curiam) (quoting Tannenbaum v. United States, 148 F.3d 1262, 1263 (11th Cir. 1998) (per curiam)).

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Crawford v. Carroll, 529 F.3d 961, 964 (11th. Cir. 2008) (citing Fed. R. Civ. P. 56(c) and Wilson v. B/E/Aerospace, Inc., 376 F.3d 1079, 1085 (11th Cir. 2004)).

"The moving party bears the initial burden of showing the court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  Allen v. Bd. of Pub. Educ. for Bibb County, 495 F.3d 1306, 1313 (11th Cir. 2007) (citations omitted).

> "When a moving party has discharged its burden, the non-moving party must then 'go beyond the pleadings,' and by its own affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate specific facts showing that there is a genuine issue for trial." Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th Cir. 1995) (citing Celotex, 477 U.S. at 324, 106 S.Ct. 2548).[9]

Id. at 1314.

## V.    Analysis

### A.    Exhaustion of Administrative Remedies

Defendants assert that Plaintiff's claims against Defendants Memnon, Newell, Crosby, Davis, Trivino, Allen and Johns must be dismissed because Plaintiff failed to exhaust his administrative remedies.  Defendants' Motion at 7-11.  The Prison Litigation Reform Act (hereinafter PLRA) amended The Civil Rights of Institutionalized Persons Act, 42 U.S.C. § 1997e, to read as follows:

> (a) Applicability of Administrative Remedies. No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional

---

[9] Celotex Corp. v. Catrett, 477 U.S. 317 (1986).

21

> facility until such administrative remedies as are available
> are exhausted.

42 U.S.C. § 1997e(a).   Exhaustion of available administrative remedies is "a precondition to an adjudication on the merits" and is mandatory under the PLRA. Bryant v. Rich, 530 F.3d 1368, 1374 (11th Cir. 2008); Jones v. Bock, 549 U.S. 199, 211 (2007); Woodford v. Ngo, 548 U.S. 81, 85 (2006) ("Exhaustion is no longer left to the discretion of the district court, but is mandatory.") (citation omitted).

In Jones v. Bock, 549 U.S. at 216, the Supreme Court found "that failure to exhaust is an affirmative defense under the PLRA, and that inmates are not required to specially plead or demonstrate exhaustion in their complaints."   The Eleventh Circuit has held that the "defendants bear the burden of proving that the plaintiff has failed to exhaust his administrative remedies."   Turner v. Burnside, 541 F.3d 1077, 1082 (11th Cir. 2008).

Exhaustion of administrative remedies is a matter in abatement and not generally an adjudication on the merits; therefore, an exhaustion defense should be raised in motion to dismiss and treated as such if raised in a motion for summary judgment.   See Bryant v. Rich, 530 F.3d at 1374-75.   "[D]eciding a motion to dismiss for failure to exhaust administrative remedies is a two-step process."   Turner v. Burnside, 541 F.3d at 1082 (citation omitted).   "First, the court looks to the factual allegations in the defendant's motion to dismiss and those in the plaintiff's response, and if they conflict, takes the plaintiff's version of the facts as true.   If, in that light, the

defendant is entitled to have the complaint dismissed for failure to exhaust administrative remedies, it must be dismissed." Id. (citing Bryant, 530 F.3d at 1373-74).

The DOC provides a three-step grievance procedure.  First, an inmate must normally submit an informal grievance, which shall be forwarded "to the staff member who is responsible in the particular area of the problem." See Chapter 33-103.005(1) of the Florida Administrative Code (hereinafter F.A.C.).  If the issue is not resolved or the inmate receives no response to the informal grievance within the time allotted, the inmate must then file a formal grievance at the institutional level. See Chapter 33-103.006, F.A.C.; Chapter 33-103.011(4), F.A.C.  If the matter is not resolved at the institutional level or the inmate receives no response to the formal grievance within the time allotted, the inmate must file an appeal to the Office of the Secretary of the DOC.  See Chapter 33-103.007, F.A.C.; Chapter 33-103.011(4), F.A.C.

In his Complaint, Plaintiff asserts that he exhausted his administrative remedies.  Complaint at 2-3.  He refers to numerous grievances and provides the log numbers for these grievances.  Id. at 19.  He states that copies of these grievances are appended to the Complaint; however, Plaintiff did not append any copies of his grievances to his Complaint.  Some of the grievances referenced by Plaintiff have been provided to the Court by Defendants.  See D.E. O.  Plaintiff also submitted additional copies of grievances regarding the claims raised in his Complaint that the

Defendants did not provide.  See P.E.[10] A4 at1-2; P.E. G at 8-10, 14-18.  Defendants

have not submitted an affidavit from the appropriate records custodian to establish

what, if any, other grievances Plaintiff may have filed regarding the claims at issue

in this case.  Thus, on the record before this Court, it is impossible to determine

whether Plaintiff exhausted his administrative remedies.  Because Defendants have

not met their burden, the Court recommends that Defendants' Motion be denied

insofar as they request the Court to dismiss the claims against Defendants Memnon,

Newell, Crosby, Davis, Trivino, Allen and Johns for Plaintiff's alleged failure to

exhaust his administrative remedies.

### B.    Excessive Force

As noted previously, Plaintiff contends that Lieutenant Newell subjected him

to cruel and unusual punishment by failing to protect him from the February 24, 2008

---

[10] The Court hereinafter refers to the exhibits submitted by Plaintiff in support of Plaintiff's Response (Doc. #106) as "P.E."  The Court notes that Plaintiff provided an index with his exhibits, which lists exhibits A1 through Q2.  However, the following exhibits that are listed in the index were not actually submitted by Plaintiff: (1) P.E. E (described as a February 24, 2008 use of force cell extraction videotape); (2) P.E. H (described as a back pain protocol form, dated April 13, 2011, submitted as exhibit 6 in Case No. 3:11-cv-55-MMH); and (3) P.E. I (described as UCI U-Dorm Quad 2 security cameras at the hours of 18:37-19:00 on February 24, 2008).  As noted previously, the Court has now obtained and reviewed the pertinent fixed force wing and hand held videotapes.  Moreover, the Court takes judicial notice of Plaintiff's previous filing in this Court in Case No. 3:11-cv-551-J-34JRK.  Exhibit 6 in the Appendix (Doc. #2) to the Complaint in that case is a Department of Corrections, Office of Health Services, Back Pain Protocol, dated April 13, 2011.  It states in this document that Plaintiff complained of mid-back pain, which started the previous month.

use of excessive and unjustified force during the cell extraction.[11]  Plaintiff also alleges that Sergeant Crosby subjected Plaintiff to cruel and unusual punishment by pulling Plaintiff's right index finger until it popped out of its joint.  In Plaintiff's Response, he also alleges that Sergeant Crosby broke Plaintiff's finger.  Plaintiff's Response at 8.  Defendants assert that summary judgment should be entered in their favor with respect to these claims.  Defendants' Motion at 12-14, 17-18.

In an excessive force case, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." Wilkins v. Gaddy, 130 S.Ct. 1175, 1178 (2010) (per curiam) (quoting Hudson v. McMillian, 503 U.S. 1, 7 (1992)).  Moreover, the law of this circuit is that "'[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'"  Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) (quoting Skrtich v. Thornton, 280 F.3d 1295, 1302 (11th Cir. 2002)).

In determining whether the force was applied maliciously and sadistically to cause harm, courts consider several factors, including: "a) the need for the application of force; b) the relationship between the need and the amount of force that was used; c) the extent of the injury inflicted upon the prisoner; d) the extent of the threat to the safety of staff and inmates; and e) any efforts made to temper the

---

[11] Because Defendants did not address the other claim against Lieutenant Newell (that he collaborated with medical staff members to give Plaintiff an involuntary injection), the Court will hereinafter assess that claim in the Court's sua sponte frivolity review.

severity of a forceful response." Fennell v. Gilstrap, 559 F.3d 1212, 1217 (11th Cir. 2009) (per curiam).  The Court must examine the facts as reasonably perceived by Defendants Newell and Crosby on the basis of the facts known to them at the time. Id.  (citing Whitley v. Albers, 475 U.S. 312, 321 (1986)).

This Court finds the Defendants have met their initial burden of showing, by reference to numerous affidavits, Plaintiff's medical records and other DOC records, and the videotapes depicting these events, that there are no genuine issues of material fact that should be decided at trial with respect to these excessive force claims against Defendants Newell and Crosby.   Defendants have presented evidence that there was a need for the application of force because Plaintiff brandished a homemade weapon[12] in front of Officer Memnon, refused to obey orders to submit to being handcuffed and resisted efforts to restrain him.   Thus, some force was required to restrain Plaintiff and remove him from the cell so that the weapon could be recovered.  The Defendants have also provided evidence that the only force applied was the amount necessary to restrain Plaintiff, escort him from his cell to the medical department and restrain him while he was treated.   Medical attention was provided very shortly after the use of the force.  Thus, immediate steps were made to temper the forceful response.

---

[12] Of course, the threat to the safety of staff and inmates posed by Plaintiff's possessing a weapon was great.

Most importantly, Plaintiff's medical records do not reflect that he received any injury as a result of the cell extraction, other than a superficial abrasion on his upper right back.  Thus, the lack of a significant injury to Plaintiff supports a finding that any use of force was de minimis.  See Vicks v. Knight, 380 Fed. App'x 847, 852 (11th Cir. 2010) (per curiam) (finding that in a case where the records did not reflect that the inmate plaintiff suffered any injury, "a reasonable factfinder could not believe that [the plaintiff] suffered any injury, and thus could not reasonably infer that [the defendant] used anything more than a de minimis amount of force against [the plaintiff]").

Because the Defendants have met this initial burden, Plaintiff is required to present his own documentation (affidavits, depositions, answers to interrogatories, admissions on file, etc.) to show that there is a genuine issue for trial.  Plaintiff has presented no evidence, other than his own allegations in the Complaint, Plaintiff's Response, and Plaintiff's Sworn Affidavit (Doc. #107),[13] to refute the Defendants' version of the events.  Plaintiff has not provided any medical records or affidavits from medical professionals to rebut the Defendants' evidence or to support his assertion that his finger was broken and his back was permanently injured during the cell extraction.  The Eleventh Circuit has found that "[s]elf-serving statements by a plaintiff do not create a question of fact in the face of contradictory,

---

[13] In his Sworn Affidavit (Doc. #107), Plaintiff asserts that the factual allegations in his Complaint and Plaintiff's Response are true and correct.

contemporaneously created medical records." Whitehead v. Burnside, 403 Fed. App'x 401, 403 (per curiam) (citing Bennett v. Parker, 898 F.2d 1530, 1530 (11th Cir. 1990))

Moreover, the evidence Plaintiff has submitted supports the Defendants' version of the events. Plaintiff submitted copies of the "Report of Force Used Work Copy" (see P.E. F) and an "Incident Report" (see P.E. J), which reflect that the members of the extraction team (Correctional Officers Joshua Bostic, William Cardinal, Anthony Crosby, Gary Allen and Michael Esford) reported that Plaintiff refused orders to be handcuffed, resisted efforts to restrain him, and that extraction teams members used only the amount of force necessary to restrain Plaintiff, escort him to the medical department, and ensure that he received the injection that had been ordered by Dr. Trivino.

As noted by the United States Supreme Court:

> At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a "genuine" dispute as to those facts. Fed. Rule Civ. Proc. 56(c). As we have emphasized, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts . . . . Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 586-587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (footnote omitted). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement

is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). **When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment**.

Scott v. Harris, 550 U.S. 372, 380 (2007) (emphasis added).

Here, the opposing parties are telling two different stories, "one of which is blatantly contradicted by the record, so that no reasonable jury could believe it." Id. If this case were to proceed to trial, Plaintiff would have only the testimony of himself to support his version of the events. However, his testimony is directly contradicted by all of the other evidence before the Court.[14] Thus, this Court concludes that no reasonable jury could find in favor of Plaintiff.

The undersigned acknowledges that in some excessive force cases the conflicting testimony of the prisoner and the correctional officers will be enough to defeat summary judgment. However, given the ease with which an excessive force allegation can be made, here, the strong and consistent testimony of the correctional officers and medical personnel, corroborated by medical records, other DOC records and the pertinent videotapes, makes this the type of case envisioned by the Supreme Court in Scott as to which summary judgment is appropriate. See also

_____

[14] In Plaintiff's Response, Plaintiff appears to argue that the videotapes of the incident would support his version of the events. See Plaintiff's Response at 9. However, as previously noted, nothing in the pertinent videotapes supports Plaintiff's excessive force claim.

Kesinger v. Herrington, 381 F.3d 1243, 1247 (11th Cir. 2004) ("a mere scintilla of evidence in support of the nonmoving party's position is insufficient to defeat a motion for summary judgment."). Therefore, the undersigned recommends Defendants' Motion be granted with respect to Plaintiff's excessive force claims against Defendants Newell and Crosby.

### C.    Supervisory Liability

Defendants contend that Lieutenant Newell and Dr. Aviles should not be held liable on the basis of respondeat superior. Defendants' Motion at 16-17. This Court agrees that Plaintiff's claims against Dr. Aviles[15] must fail because Plaintiff is attempting to hold Dr. Aviles liable based on supervisory liability and/or for failure to grant Plaintiff's grievances.

> "Supervisory officials are not liable under section 1983 on the basis of respondeat superior or vicarious liability." Belcher v. City of Foley, Ala., 30 F.3d 1390, 1396 (11th Cir. 1994) (internal quotation marks and citation omitted). "The standard by which a supervisor is held liable in her individual capacity for the actions of a subordinate is extremely rigorous." Gonzalez,[16] 325 F.3d at 1234 (internal quotation marks and citation omitted). "Supervisory liability occurs either when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between

---

[15] It does not appear that Plaintiff is attempting to hold Lieutenant Newell liable on the basis of respondeat superior. Plaintiff alleges that Lieutenant Newell personally participated in the alleged constitutional violations by failing to protect Plaintiff from assault during and after the cell extraction and by collaborating with medical personnel to give Plaintiff an involuntary injection.

[16] Gonzalez v. Reno, 325 F.3d 1228 (11th Cir. 2003).

> actions of the supervising official and the alleged
> constitutional deprivation." Brown v. Crawford, 906 F.2d
> 667, 671 (11th Cir. 1990).

Danley v. Allen, 540 F.3d 1298, 1314 (11th Cir. 2008).

As noted above, Plaintiff asserts that Dr. Aviles was deliberately indifferent to Plaintiff's serious medical needs. However, in his deposition, Plaintiff admitted that he never actually saw Dr. Aviles, but Dr. Aviles denied Plaintiff's grievances regarding Plaintiff's medical care. See D.E. R1-R2. Thus, it appears that Plaintiff is attempting to hold Dr. Aviles liable on the basis respondeat superior.[17]

Moreover, the mere fact that Dr. Aviles denied Plaintiff's grievances regarding Plaintiff's medical care is insufficient to impose liability under § 1983, given the record reflects that medical personnel provided adequate care. See Larson v. Meek, 240 Fed. App'x 777, 780 (10th Cir. 2007) (finding that a defendant's "denial of the grievances alone is insufficient to establish personal participation in the alleged constitutional violations"); Baker v. Rexroad, 159 Fed. App'x 61, 62 (11th Cir. 2005) (per curiam) ("Because the failure of [the defendants] to take corrective action upon the filing of [the plaintiff]'s administrative appeal at the institutional level did not amount to a violation of due process, the district court properly determined that [the plaintiff] failed to state a claim under § 1983"); Shehee v. Luttrell, 199 F.3d 295, 300

---

[17] Even assuming arguendo that Plaintiff could establish a causal connection between actions or inaction of Dr. Aviles and the alleged constitutional deprivation, the record does not reflect that any of the Defendants were deliberately indifferent to Plaintiff's serious medical needs. See Defendants' Motion at 20-21.

(6th Cir. 1999) (finding that prison officials who were not involved in an inmate's termination from his commissary job, and whose only roles involved the denial of administrative grievances or the failure to act, were not liable under § 1983 on a theory that the failure to act constituted an acquiescence in the unconstitutional conduct).   Thus, the undersigned will recommend that summary judgment be entered in favor of Dr. Aviles.

### D.    Disciplinary Report

With respect to his disciplinary report for possession of a weapon, Plaintiff asserts that: (1) Officer Memnon falsified the February 24, 2008 disciplinary report for possession of a weapon, in violation of the Eighth and Fourteenth Amendments to the United States Constitution; (2) Michael Davis deprived Plaintiff of due process of law by failing to adequately review the disciplinary reports before forwarding the falsified reports to the disciplinary team; and (3) James Johns and Joseph Allen deprived Plaintiff of due process of law by finding Plaintiff guilty of the charge of possession of a weapon without following proper procedures.   Defendants contend that they are entitled to summary judgment with respect to these claims. Defendants' Motion at 18-20.

In Wolff v. McDonnell, 418 U.S. 539, 555-57 (1974), the Supreme Court held that a prisoner had a protected liberty interest in statutory good time credits,[18] and

---

[18] Of course, in this case, Plaintiff did not lose any gain time; however, the undersigned will use the Wolff standard in assessing Plaintiff's due process claim.

therefore had a constitutional right to procedural due process in a disciplinary hearing.

The Supreme Court in <u>Wolff</u> outlined the specific hearing procedures that prison disciplinary panels must comply with to satisfy the standards of procedural due process in the prison setting. <u>Id</u>. at 556, 94 S.Ct. at 2975 ("Prison disciplinary proceedings are not part of a criminal prosecution, and the full panoply of rights due a defendant in such proceedings does not apply."). <u>Wolff</u> instructed that prisoners must receive: (1) advance written notice of the charges against them; (2) an opportunity for the inmate to call witnesses and present documentary evidence, so long as doing so is consistent with institutional safety and correctional goals; and (3) a written statement by the factfinder outlining the evidence relied on and the reasons for the disciplinary action. <u>Id</u>. at 563–67, 94 S.Ct. at 2978–80.

Similarly, in <u>Superintendent v. Hill</u>, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), the Supreme Court . . . instructed that the revocation of good time credits only satisfies minimal standards of procedural due process if "the findings of the prison disciplinary board are supported by *some evidence* in the record." <u>Id</u>. at 454, 105 S.Ct. at 2773 (emphasis added). The Supreme Court also advised that "[a]scertaining whether this [due process] standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence." <u>Id</u>. at 455, 105 S.Ct. at 2774. According to the Supreme Court, "the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board." <u>Id</u>. at 455–56, 105 S.Ct. at 2774 (emphasis added). Applying these rules, the Supreme Court determined that the complaining guard's oral testimony and written report were "sufficient to meet the requirements imposed by the Due Process Clause." <u>Id</u>. at 456, 105 S.Ct. at 2774.

O'Bryant v. Finch, 637 F.3d 1207, 1213-14 (11th Cir. 2011) (per curiam) (footnotes omitted), cert. denied, 133 S.Ct. 445 (2012).

As an initial matter, even assuming arguendo that Officer Memnon falsely alleged in the disciplinary report that Plaintiff possessed a weapon, such an issue does not rise to the level of a federal constitutional claim.   See Rodgers v. Singletary, 142 F.3d 1252, 1253 (11th Cir. 1998) (per curiam) (finding that an inmate was not deprived of a constitutionally protected liberty interest when he was placed in administrative confinement as result of an allegedly false disciplinary report); Palmisano v. Bureau of Prisons, 258 Fed. App'x 646, 648 (5th Cir. 2007) (per curiam) (finding that the plaintiff's "assertion that defendants brought false charges against him does not alone implicate his constitutional rights"); Freeman v. Rideout, 808 F.2d 949 (2nd Cir. 1986) (finding that the filing of a false or unfounded misconduct charge against an inmate does not constitute a deprivation of a constitutional right), cert. denied, 485 U.S. 982 (1988).

Moreover, here, the record reflects that Plaintiff received all the process to which he was due.  He received  advance written notice of the charge against him on March 18, 2008.  D.E. N1.  He appeared at the March 28, 2008 hearing on the disciplinary report.  Id.  He was offered and refused staff assistance.  Id.  He offered into evidence the videotape from the U-Dorm Quad 2 camera (for the period between 4:30 p.m. and 5:00 p.m. on February 24, 2008), which he claimed would "show Officer Memnon go in [Plaintiff's] cell while [Plaintiff] was in the shower."  D.E.

N1E.  The officer who investigated the charge and Plaintiff's allegation regarding the videotape, Officer Daniel E. Ledwith, stated that "based upon review of the video tape it did not appear to me that Officer Memnon went into the cell at the time the inmate claims he did."  D.E. N1 (some capitalization omitted).  After the hearing, the following written basis for finding Plaintiff guilty of the charge was provided:

> Subject was found guilty of charge 3-1 based upon the eyewitness testimony of Officer Memnon as stated in section I that he approached the cell U2-101L that housed inmate Howard and the subject showed Officer Memnon a homemade shank and told the officer that he was gonna "stick my pussy black ass."  A cell extraction was conducted and the homemade weapon was confiscated consisting of an eyeglass temple that had been sharpened at one end with cloth wrapped around the other end to form a handle.

D.E. N1-N1A (some capitalization omitted).  Accordingly, all of the Wolff factors were met in Plaintiff's case.

As punishment, Petitioner received sixty days of disciplinary confinement.  See D.E. N1B.  However, on April 25, 2008, the warden overturned the disciplinary report due to a technical error (the absence, in the disciplinary report, of the name of the officer who actually found the weapon).  Insofar as Plaintiff asserts a due process violation based upon the days he spent in disciplinary confinement before the disciplinary report was overturned, such a claim is unavailing.  See Sandin v. Conner, 515 U.S. 472, 486 (1995) (concluding that thirty days of disciplinary confinement did not give rise to a protected liberty interest); Rodgers v. Singletary,

142 F.3d at 1253 (concluding two months in administrative confinement did not constitute a deprivation of a constitutionally protected liberty interest).  Therefore, the undersigned recommends that summary judgment be entered in favor of Officer Memnon, Michael Davis,[19] James Johns and Joseph Allen.

### E.   Qualified Immunity

Defendants Allen and Johns claim that they are entitled to qualified immunity. Defendants' Motion at 22-23.

> "Qualified immunity offers complete protection for government officials sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known."  Lee v. Ferraro, 284 F.3d 1188, 1193–94 (11th Cir. 2002) (quoting Thomas v. Roberts, 261 F.3d 1160, 1170 (11th Cir. 2001) (internal quotations omitted)).  To claim qualified immunity, a defendant must first show he was performing a discretionary function.  Mercado v. City of Orlando, 407 F.3d 1152, 1156 (11th Cir. 2005) (citation omitted).  The burden then shifts to the plaintiff to show that: (1) the defendant violated a constitutional right; and (2) the right was clearly established at the time of the violation.  Id. at 1156.

Barnes v. Zaccari, 669 F.3d 1295, 1303 (11th Cir. 2012).

Here, it appears to be undisputed that Defendants Allen and Johns were performing discretionary functions as members of the disciplinary team at all material

---

[19] Moreover, entry of summary judgment in favor of Michael Davis is also appropriate because the record does not reflect that he had any involvement with the processing of the disciplinary report, other than "authoriz[ing] the presence of another classification officer to be present for training purposes and [noting] on the Grievance Appeal Action Form that [Plaintiff's] disciplinary report was removed from the database."  D.E. G.

times.  Thus, to defeat qualified immunity on a motion for summary judgment, Plaintiff must show that, when the facts are viewed in the light most favorable to him, Defendants Allen and Johns violated a constitutional right.  As noted above, the Court has found that, even when the evidence is viewed in the light most favorable to Plaintiff, Defendants Allen and Johns did not violate Plaintiff's constitutional rights in connection with the handling of Plaintiff's disciplinary report for possession of a weapon.  Thus, Defendants Allen and Johns are entitled to qualified immunity.

### VI.    Sua Sponte Frivolity Review

The Court will conduct an independent frivolity review of Plaintiff's remaining claims, which are: (1) Lieutenant Newell subjected Plaintiff to cruel and unusual punishment by collaborating with medical staff members to give Plaintiff an involuntary injection; (2) Nurse Payne and Nurse Green subjected Plaintiff to cruel and unusual punishment by injecting Plaintiff without his consent; (3) Dr. Trivino subjected Plaintiff to cruel and unusual punishment by authorizing the injection; and (4) all of the Defendants violated Plaintiff's rights to equal protection and due process of law based upon the factual allegations in the Complaint.

The PLRA requires the Court to dismiss a claim at any time if it determines that the claim is frivolous, malicious, fails to state a claim upon which relief can be granted or seeks monetary relief against a defendant who is immune from such relief.  See 28 U.S.C. § 1915A.  Additionally, the Court must read Plaintiff's pro se

allegations in a liberal fashion.  Haines v. Kerner, 404 U.S. 519 (1972); see also Miller v. Stanmore, 636 F.2d 986, 988 (5th Cir. 1981).

"A claim is frivolous if it is without arguable merit either in law or fact."  Bilal v. Driver, 251 F.3d 1346, 1349 (11th Cir.) (citing Battle v. Central State Hospital, 898 F.2d 126, 129 (11th Cir. 1990)), cert. denied, 534 U.S. 1044 (2001).  Frivolity dismissals should be ordered only when the legal theories are "indisputably meritless," Neitzke v. Williams, 490 U.S. 319, 327 (1989), or when the claims rely on factual allegations which are "clearly baseless."  Denton v. Hernandez, 504 U.S. 25, 32 (1992).  "Frivolous claims include claims 'describing fantastic or delusional scenarios, claims with which federal district judges are all too familiar.'"  Bilal, 251 F.3d at 1349 (quoting Neitzke, 490 U.S. at 328).  Additionally, a claim may be dismissed as frivolous when it appears that a plaintiff has little or no chance of success.  Bilal v. Driver, 251 F.3d at 1349.

"To state a claim under 42 U.S.C. § 1983, a plaintiff must allege that (1) the defendant deprived him of a right secured under the United States Constitution or federal law and (2) such deprivation occurred under color of state law."  Richardson v. Johnson, 598 F.3d 734, 737 (11th Cir. 2010) (per curiam) (citations omitted).  Furthermore, the Eleventh Circuit "'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation' in § 1983 cases."  Rodriguez v. Sec'y, Dep't of Corr., 508 F.3d 611, 625 (11th Cir. 2007) (quoting Zatler v. Wainwright, 802 F.2d 397, 401 (11th Cir. 1986)).  More than

conclusory and vague allegations are required to state a cause of action under 42 U.S.C. § 1983.  See L.S.T., Inc., v. Crow, 49 F.3d 679, 684 (11th Cir. 1995) (per curiam); Fullman v. Graddick, 739 F.2d 553, 556-57 (11th Cir. 1984).

The undersigned will address the claim against Dr. Trivino first.  Plaintiff alleges that Dr. Trivino violated his rights under the Eighth Amendment because she authorized "unjustified excessive force by administration of involuntary medication[.]" Complaint at 12.  However, it appears to be uncontroverted that Dr. Trivino "received a telephone call from nursing staff at Union Correctional Institution informing [her] that inmate Michael Howard was acting in an agitated state with hostile and physical aggression."  Ex. J.  Of course, she "had no reason to doubt the accuracy of the reports of Howard's behavior."  Dr. Trivino, Dr. Aviles and Dr. Hercule all agree that Dr. Trivino's emergency treatment order was an appropriate medical decision given the circumstances reported to her.  There is simply no evidence, other than Plaintiff's wholly conclusory and unsubstantiated allegations, that Dr. Trivino ordered such treatment "maliciously and sadistically to cause harm."  Wilkins v. Gaddy, 130 S.Ct. at 1178.  Thus, the undersigned will recommend that the claims against this Defendant be dismissed as frivolous.

Similarly, Plaintiff's claims against Nurses Payne and Green are frivolous. The records reflect that the injection was administered by order of Dr. Trivino. Again, there is simply no evidence, other than Plaintiff's wholly conclusory and unsubstantiated allegations, that Nurse Green, assisted by Nurse Payne, injected

39

Plaintiff "maliciously and sadistically to cause harm." Id. Therefore, the undersigned will recommend that the claims against Nurses Payne and Green be dismissed as frivolous.

Plaintiff also contends that Lieutenant Newell subjected Plaintiff to cruel and unusual punishment by collaborating with medical staff members to give Plaintiff an involuntary injection.  Again, this wholly conclusory claim is belied by all of the evidence before this Court, except for Plaintiff's conclusory allegations.  The undersigned concludes that Plaintiff has little or no chance of succeeding on this claim should this case proceed to trial.  Accordingly, the undersigned will recommend that this claim be dismissed as frivolous.

As his final claim, Plaintiff contends that, based upon the factual allegations in the Complaint, the Defendants violated Plaintiff's rights to equal protection and due process of law.  The undersigned has concluded that Defendants are entitled to summary judgment with respect to the due process claims raised in connection with Plaintiff's disciplinary report for possession of a weapon.  No other factual allegations in the Complaint would support any equal protection claim or any other due process claim.  Thus, the undersigned will recommend that this claim be dismissed as frivolous.[20]

---

[20] Defendants also contend that Plaintiff's requests for compensatory and punitive damages are barred pursuant to 42 U.S.C. § 1997e(e) (providing that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for mental or emotional injury suffered while in custody without a prior showing of physical

(continued...)

The undersigned recommends that all of these frivolous claims be dismissed with prejudice because it would be futile for Plaintiff to try to amend.  The record reflects that these claims are indisputably meritless and rely on factual allegations which are clearly baseless.  See Simmons v. Edmondson, 225 Fed. App'x 787, 788-89 (11th Cir. 2007) (per curiam) (finding that "the district court did not err by failing to give [the plaintiff] the opportunity to amend his complaint prior to dismissing it with prejudice as no amendment could have overcome the defendants' immunity and would have been futile"); Medberry v. Butler, 185 F.3d 1189, 1193 (11th Cir. 1999) (finding that the district court did not err by failing to give the plaintiff the opportunity to amend his complaint prior to dismissing it with prejudice because allowing him to amend his complaint would have been futile).

## RECOMMENDATION

Accordingly, it is respectfully **RECOMMENDED** that:

1.      Defendants' Motion  (Doc. #96) be **GRANTED** and summary judgment be entered in favor of the following Defendants: Robert Newell; Anthony Crosby; Julian Aviles; Jacques Memnon; Michael Davis, James Johns; and Joseph Allen.

2.      The remaining claims be **DISMISSED** with prejudice as frivolous.

---

[20](...continued)
injury").  Motion at 14-16.  The undersigned need not reach this issue because all of the claims raised in the Complaint have been resolved in favor of the Defendants.

3.      Plaintiff's Motion to Reopen Discovery (Doc. #131) be **DENIED**.[21]

4.      The Clerk be directed to enter Judgment against Plaintiff and in favor

of all of the Defendants.

5.      The Clerk be directed to close the file.

**DONE AND ENTERED** at Jacksonville, Florida, on February 12, 2013.


_Joel B. Toomey_

JOEL B. TOOMEY
United States Magistrate Judge


Copies to:
The Honorable Timothy J. Corrigan, United States District Judge
Michael Antwon Howard
Counsel of Record

---

[21] Although Plaintiff had until October 15, 2012, to engage in discovery, he now seeks to reopen discovery so that he may obtain copies of the security videotapes and seek admissions from the Defendants that would relate to "Plaintiff's claim of compensatory and punitive damages." Motion to Reopen Discovery (Doc. #131) at 1. However, both Plaintiff and the Court have reviewed the pertinent videotapes, and they are now part of the record. Furthermore, the Court has found that it need not reach the issue of whether Plaintiff is entitled to compensatory or punitive damages. Therefore, the motion is due to be denied.